# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO. 07-CR-318 |
| MAYER FINKELSTEIN | SECTION "R" |

## MEMORANDUM IN SUPPORT OF MAYER FINKELSTEIN'S MOTION FOR INJUNCTIVE AND DECLARATORY RELIEF

**MAY IT PLEASE THE COURT:**

Mr. Finkelstein has pleaded guilty and served his term of imprisonment. In preparation for his transition back into society, he has indicated his desire to return to his home of more than 35 years, at 401 State Street in New Orleans, Louisiana. The USPO and the State have rejected Mr. Finkelstein's plan to return to his home, because it is less than 1,000 feet from a school (it is 736 feet, to be exact), citing the residency-restriction statute, La. Rev. Stat. § 14:91.2. Mr. Finkelstein moves the Court to enjoin the USPO and the State from enforcing § 14:91.2 against him because its application violates several constitutional principles. Those violations are addressed in three sections, starting with the narrowest, that the law is unconstitutional, as applied to Finkelstein at 401 State Street; to the second-most narrow, that the law is unconstitutional as applied to Finkelstein at any location; to the broadest, that the law is unconstitutional on its face.

## I. THE LAW IS UNCONSTITUTIONAL, AS APPLIED TO FINKELSTEIN AT HIS HOME ON STATE STREET.

### A. Application of § 14:91.2 to Finkelstein violates the *Ex Post Facto* Clause because Finkelstein established his residence before enactment of the statute.

The United States Constitution provides that "[n]o Bill of Attainder or ex post facto Law shall be passed."[1] An *ex post facto* law is one which imposes a punishment for an act which was not punishable at the time it was committed, imposes a punishment greater than that prescribed at the time the crime was committed, changes the rules of evidence by which less or different testimony is sufficient to convict, or deprives a defendant of a defense available at the time he committed the act.[2] A criminal or penal statute is considered to be *ex post facto* only when the statute is retrospective and disadvantages the offender affected by it.[3] A statute is "retrospective" if it applies to events occurring before its enactment.[4]

The Fifth Circuit has not passed on the validity of Louisiana Revised Statute § 14:91.2.[5] Other federal circuits, however, have examined other states' residency-restriction laws. Upholding Iowa's sex offender residency-restriction law, the Eighth Circuit held that the "residency restriction is not unconstitutional on its face. A majority of the panel further conclude[d] that the statute does not amount to unconstitutional *ex post facto* punishment of persons who committed offenses prior to…[the law's enactment]."[6]

---

[1] U.S. Const. Art. I, § 9, cl. 3.
[2] *Collins v. Youngblood,* 497 U.S. 37, 45-46 (1990).
[3] *Weaver v. Graham,* 450 U.S. 24, 29 (1981).
[4] *Id.*
[5] There two bodies of case law: one that concerns sex offender registration requirements, and another that concerns sex offender residency restrictions. The United States Supreme Court has not passed on the constitutionality of *any* state *residency-restriction* statute. *Smith v. Doe,* 538 U.S. 84 (2003), upheld Alaska's sex offender registration scheme as constitutional, but that scheme did not contain a residency restriction.
[6] *Doe v. Miller*, 405 F.3d 700, 705 (8th Cir. 2005). *See also Weems v. Little Rock Police Dep't,* 453 F.3d 1010, 1013 (8th Cir. 2006) ("The [Arkansas] statute excludes from the residency

But the Eighth Circuit's conclusion that the residency restriction did not violate the *Ex Post Facto* Clause rested on the fact that "[w]ith respect to many offenders, the statute does not even require a change of residence: the Iowa General Assembly included a grandfather provision that permits sex offenders to maintain a residence that was established prior to July 1, 2002, even if that residence is within 2000 feet of a school or child care facility[:]"[7]

> Iowa Senate File 2197, now codified at Iowa Code § 692A.2A, took effect on July 1, 2002. It provides that persons who have been convicted of certain criminal offenses against a minor, including numerous sexual offenses involving a minor, shall not reside within 2000 feet of a school or registered child care facility. Iowa Code § 692A.2A(1)-(2). The law does not apply to persons who established a residence prior to July 1, 2002, or to schools or child care facilities that are newly located after July 1, 2002. *Id.* § 692A.2A(4)(c).[8]

Iowa's residency restriction is markedly different from Louisiana's. The Iowa law does not apply to offenders who established their residence before the law's enactment. **Louisiana Revised Statute § 14:91.2 does not have a comparable exception**. As a result, the USPO and Louisiana are applying a restriction that became effective on August 15, 2006[9]—*retroactively*—to prevent Finkelstein from returning to his home, where he established his residence in 1976.

To determine whether a state statute violates the *Ex Post Facto* Clause, a court must first "ascertain whether the legislature meant the statute to establish 'civil' proceedings."[10] If the legislature intended criminal punishment, then the legislative intent controls the inquiry and the law is necessarily punitive.[11] If, however, the legislature intended its law to be civil and

---

restriction any Level 3 or 4 offender residing in a property he owned and occupied before the school or daycare center opened or before July 16, 2003.").
[7] *Id.* at 719.
[8] *Id.*
[9] OFFENSES AFFECTING GENERAL MORALITY, 2006 La. Sess. Law Serv. Act 40 (H.B. 882) (WEST).
[10] *Smith,* 538 U.S. at 92 (internal quotation marks omitted).
[11] *Id.*

nonpunitive, then a court must determine whether the law is nonetheless "so punitive either in purpose or effect as to negate" the State's nonpunitive intent.[12]

Louisiana's residency-restriction statute is a part of Title 14, "Criminal Code."[13] A statute's codification, however, is not dispositive.[14] But the legislative intent behind this restriction is very clearly stated: to "create a crime" and "provide for penalties." The House Bill passed to establish Louisiana's residency-restriction law is self-described as "AN ACT to enact R.S. 14:91.2, relative to offenses affecting general morality; to create the crime of unlawful residence or presence of a sex offender; to provide for penalties…."[15] Further, the law contains no exemptions for offenders who were convicted before the statute was enacted, who lived in a restricted zone before it was enacted, or who properly established a residence in compliance with a statute, only to have a new school or day care center open within 1,000 feet in the future.

Accordingly, the law is "necessarily punitive."[16] As a result, Mayer Finkelstein will be punished (and subject to state and federal prosecutions) for the simple act of going home. This punishment is greater than the punishment that 18 U.S.C. § 2252(a)(4)(B) annexed to the crime, when Finkelstein committed it.

### B. Section 14:91.2 is an unconstitutional infringement upon Finkelstein's right to associate.

In addition to restricting the places where a sex offender may reside, § 14:91.2 also restricts the *mere presence* of a sex offender "in, on, or within one thousand feet of the school property of any public or private elementary or secondary school or the physical presence in any

---

[12] *Id.* (internal quotations and citations omitted).
[13] *Cf.* La. Rev. Stat. § 15:540, *et seq.* Louisiana's sex offender registration scheme is not in the Criminal Code under Title 14, but under Title 15, Criminal Procedure.
[14] *Smith*, 538 U.S. at 94.
[15] 2006 La. Sess. Law Serv. Act 40 (H.B. 882).
[16] *Smith,* 538 U.S. at 92.

4

motor vehicle or other means of conveyance owned, leased, or contracted by such school to transport students to or from school or a school-related activity when persons under the age of eighteen years are present on the school property or in a school vehicle[,]"[17] *and* "in, on, or within one thousand feet of a public park, recreational facility, or child care facility as defined in R.S. 46:1403[,]"[18] *and* "in or on public library property."[19]

In Finkelstein's case, not only does this mean that he cannot *live* in his house—he cannot even go there, for any reason. This is both a complete interference with his rights as a property owner (discussed in the due process section, below), and an infringement upon his freedom to associate because his partner of more than 25 years resides in Finkelstein's house at 401 State Street.

> The Supreme Court has long recognized that,
>
> because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. [ ] Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. [ ] Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. [ ].
>
> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, e.g., Zablocki v. Redhail, supra; childbirth, e.g., Carey v. Population Services International, supra; the raising and education of children, e.g., Smith v. Organization of Foster Families, supra; and **cohabitation with**

---

[17] La. Rev. Stat. § 14:91.2(A)(1).
[18] *Id.* § 14:91.2(A)(3).
[19] *Id.* § 14:91.2(A)(5).

5

**one's relatives**, e.g., Moore v. East Cleveland, supra. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees.

Between these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State. Determining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments.[20]

To determine whether an association warrants First Amendment protection, courts should consider "factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship."[21] The relationship at issue here is Finkelstein's romantic relationship with his partner of more than 25 years. The factors are obvious: the size is two, the purpose is deeply intimate, the membership is highly selective, and nearly everyone is excluded from critical aspects of it.

The right to choose how to conduct a family's affairs, including the decision of where and with whom in the family to live, is a right held by all members of the family: not just Finkelstein, but his partner, too. The statute interferes with that right in such an extreme way

---

[20] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618-20 (1984) (internal citations omitted) (emphasis added).
[21] *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987).

that it would force Finkelstein's partner to move, not only so they could reside together, but so they could see each other, because Finkelstein would be committing a crime by picking her up *at his own house.*

## II. THE LAW IS UNCONSTITUTIONAL, AS APPLIED TO FINKELSTEIN AT ANY LOCATION.

### A. Application of § 14:91.2 to Finkelstein violates the *Ex Post Facto* Clause because it is a criminal statute, and it did not incorporate Finkelstein's offense of conviction when Finkelstein committed the crime.

The enforcement of the current terms and provisions of La. Rev. Stat. § 14:91.2 against Finkelstein would constitute a violation of the *Ex Post Facto* Clauses of the Constitution of the United States (Art. I, § 10) and the Constitution of the State of Louisiana (1974), because "sex offense" as used by § 14:91.2, and defined by La. Rev. Stat. § 15:541(24)(a), did not incorporate or contain the crime of pornography involving juveniles (La. Rev. Stat. § 14:81.1) until January 1, 2008[22], after Finkelstein committed and pleaded guilty to the federal offense for which he was prosecuted.[23]

A criminal or penal statute is considered to be *ex post facto* only when the statute is retrospective and disadvantages the offender affected by it.[24] A statute is "retrospective" if it applies to events occurring before its enactment.[25] Here, the statute, as applied to Finkelstein, became effective on January 1, 2008. The statute is being applied to Finkelstein to restrict where he may live because of a crime that Finkelstein committed and pleaded guilty to before its enactment—committed before May 14, 2007, to be exact.

---

[22] SEX OFFENDER REGISTRATION AND NOTIFICATION LAWS, 2007 La. Sess. Law Serv. Act 460 (H.B. 970).
[23] "Beginning at a time unknown and continuing until on or about May 14, 2007…." Rec. Doc. 1, Count 1 of the Bill of Information.
[24] *Weaver v. Graham,* 450 U.S. 24, 29 (1981).
[25] *Id.*

The residency-restriction statute is criminal, unlike the sex offender registration schemes that are civil and regulatory.[26] As a result, this case does not fall under the many cases holding that a sex offender must register, even if he was convicted long before the registration statute was enacted.

A district court in the Northern District of Ohio enjoined the County Prosecutor from enforcing Ohio's residency-restriction statute against a sex offender who was convicted of a sex offense and lived in a restricted zone before the enactment of the Ohio law.[27] The Ohio law, like Louisiana's, did not contain a "Grandfather Clause" exempting sex offenders who were convicted before the law became effective, or who owned their homes before its effective date, or for sex offenders who established a residence in compliance with the statute before a school or day care center moved within 1,000 feet of that residence.[28]

In that case, the plaintiff, Mikaloff, was paroled to his family home in 2002, after pleading guilty and serving a sentence for a rape that he committed in 1986.[29] In late 2005, approximately three years after returning home, and one year after completing parole, the County Sheriff sent a letter to Mikaloff stating that Mikaloff must move because his residence was within 1,000 feet of a school, and that if Mikaloff would not move voluntarily, the Sheriff would seek an order forcing him to move.[30] The basis of the Sheriff's letter was a residency-restriction statute that became effective on July 31, 2003, and, effective April 29, 2005, permitted prosecutors to seek injunctive relief to require a sex offender to vacate a home in a restricted

---

[26] *See Smith,* 538 U.S. at 100 (noting that sex offender registration requirements "[did] not restrain activities sex offenders may pursue but leaves them free to change jobs or residences"). This suggests that residency restrictions present a different case from registration and notification provisions.
[27] *Mikaloff v. Walsh,* 5:06-CV-96, 2007 WL 2572268 (N.D. Ohio Sept. 4, 2007).
[28] *Id.* at *3.
[29] Mikaloff's mother, not Mikaloff, owned the family home. *Id.* at *2.
[30] *Id.* at *1-2.

8

zone.[31] The district court noted that the implications of Ohio's residency-restriction statute go far beyond preventing an offender from living in his home:

> In this case, the law prevents a sex offender from living in his own home, even if he purchased the home before the law took effect or if a daycare or school moved within 1,000 feet of his home after he established residency there. This is a substantial housing disadvantage. While the law does not affect ownership of property, it affects one's freedom to live on one's own property. A sex offender is subject to constant eviction, and there is no way for him or her to find a permanent home. For, there are no guarantees a school or daycare will not open up within 1,000 feet of anywhere. This may prevent an offender from purchasing a home, from remodeling it, or even from entering into long-term service contracts for amenities such as cable television. Judge Sheehan, Kenton District Court, Fourth Division in the Commonwealth of Kentucky discussed how residency restrictions could impact "where an offender's children attend school, access to public transportation for employment purposes, access to employment opportunities, access to residential alcohol and drug abuse rehabilitation programs and even access to medical care and residential nursing home facilities for the aging offender." *Commonwealth v. Baker,* 07-M-00604 (Kenton Dist. C., 4th Div. Apr. 20, 2007) *cert. granted* Aug. 23, 2007, 2007-SC-000347. This Court agrees that "residency restrictions carry major consequences above and beyond the location of one's home." *Id.*
>
> Further, the Ohio law affirmatively restrains Plaintiff in this case. Plaintiff Mikaloff is not "free to change residences," but can only move to homes that are not within 1,000 feet of a school. Even more onerous, Plaintiff is not free to remain in his family home, a home that has been in his family for more than 50 years and where he can live rent-free.[32]

The district court found that the statute was punitive, and because it was enacted after Mikaloff's crime, conviction, and sentence, the residency restriction violated the *Ex Post Facto* Clause, and enjoined its enforcement against Mikaloff.[33]

---

[31] *Id.* at *2.
[32] *Id.* at *9.
[33] *Id.* at *13. *See also F.R. v. St. Charles Cnty. Sheriff's Dep't*, 301 S.W.3d 56 (Mo. 2010) ("Missouri's "School Residency Law," … prohibits convicted sex offenders from residing within 1,000 feet of any school or child-care facility. Because F.R. was convicted and sentenced before the "school residency law" was enacted, section 566.147, as applied to F.R., is unconstitutionally retrospective in its operation."); *Com. v. Baker*, 295 S.W.3d 437, 447 (Ky. 2009) ("Although the General Assembly did not intend KRS 17.545 to be punitive, the residency restrictions are so punitive in effect as to negate any intention to deem them civil. Therefore, the statute may not

9

"One function of the *Ex Post Facto* Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its **commission**."[34] Finkelstein committed the crime that is triggering the application of § 14:91.2 before May 14, 2007. The sex offenses covered by § 14:91.2, however, did not include the crime of pornography involving juveniles (La. Rev. Stat. § 14:81.1)—the State analog to 18 U.S.C. § 2252(a)(4)(B)—until January 1, 2008. As a result, application of § 14:91.2 to Finkelstein, at any location, violates the *Ex Post Facto* Clause.

### B. Application of § 14:91.2 to Finkelstein constitutes an unlawful and unconstitutional taking of property and deprivation of liberty without due process of law.

To prevail on a takings claim, a plaintiff first must demonstrate that he has a protectable property interest.[35] The rights to use one's property and to live in one's home are the most basic and obvious of these interests.[36] Takings, as prohibited by the Fifth and Fourteenth Amendments, have been divided into two categories: per se and regulatory. The plain language

---

constitutionally be applied to those like Respondent, who committed their crimes prior to July 12, 2006, the effective date of the statute. To do so violates the ex post facto clauses of the United States and Kentucky constitutions."); *State v. Pollard*, 908 N.E.2d 1145, 1154 (Ind. 2009) ("Pollard was charged with, convicted of, and apparently served the sentence for a crime qualifying him as an offender against children before the residency restriction statute was enacted. We conclude that as applied to Pollard, the statute violates the prohibition on ex post facto laws contained in the Indiana Constitution because it imposes burdens that have the effect of adding punishment beyond that which could have been imposed when his crime was committed.").

[34] *Garner v. Jones*, 529 U.S. 244, 249-50 (2000) (emphasis added) (*citing Collins v. Youngblood*, 497 U.S. 37, 42 (1990); *Beazell v. Ohio,* 269 U.S. 167, 169-170 (1925)).
[35] *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984).
[36] *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572 (1972) (*citing Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)) ("Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men.") (internal quotation marks omitted).

of the Fifth Amendment prohibits uncompensated per se takings.[37] These governmental actions involving condemnations and physical invasions have a long legal history and generally require the straightforward application of per se rules.[38]

Regulatory takings jurisprudence is characterized by "'essentially ad hoc, factual inquiries' designed to allow 'careful examination and weighing of all the relevant circumstances.'"[39] In *Penn Central*, the seminal case on this issue, the Supreme Court created a multifactor test to determine whether a regulatory taking has occurred. The *Penn Central* framework directs courts to consider three factors: (1) the character of the governmental action, (2) the economic impact on the claimant, and (3) the extent to which the regulation has interfered with the property owner's reasonable investment backed expectations.[40]

Here, Louisiana's § 14:91.2 amounts to a deprivation of Finkelstein's property rights in his home on State Street. Finkelstein submitted his release plan to the USPO, as required before his release, and noticed his intent to return to his home of more than 35 years. The USPO rejected that plan. Finkelstein then submitted an amended release plan, proposing that he reside at a different location. This amended plan was approved. It is without question that the USPO denied the initial release plan because Finkelstein's home on State Street is less than 1,000 feet from a school. As a result, the USPO and the State, through its implementation of this law, are directly depriving Finkelstein of his right to use his property.

The USPO and the State of Louisiana are not physically occupying Finkelstein's

---

[37] See U.S. CONST. amend V ("[N]or shall private property be taken for public use, without just compensation.").
[38] *See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002).
[39] *Id*. (citing *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978); *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring)).
[40] *Penn Central*, 438 U.S. at 124-25.

property.  Rather, they are regulating it in such a way so as to deprive Finkelstein of the value of his property, and of the inalienable bundle of rights that come with it—*usus*, *abusus*, and *fructus*.[41]  Because this is a regulatory taking, the *Penn Central* factors must be considered.

The first *Penn* factor is the character of the governmental action.  Although the government has not physically taken Finkelstein's property, the deprivation here does make Finkelstein's property rights "wholly useless."  He can neither live in the property, nor even visit it.  Were he to lease the property to a third party, he could not go to the property to collect the rent, or to make needed repairs.  In short, all that Finkelstein can do is sell the property—from a distance, being prohibited from going to the property to remove his furniture, his clothing, or his personal effects.

The second *Penn* factor is the economic impact on the claimant.  At present, Finkelstein is facing a forced sale of the property—a fact that necessarily depresses its price.  But more importantly, he has been deprived of his right to live in a dwelling that is paid for; *i.e.*, one in which he could live rent-free.  Now, he will be compelled to pay rent to a third party.  That economic impact cannot be ascertained at this point, but it will no doubt be substantial.

The third factor is the extent to which the regulation has interfered with the property owner's reasonable investment-backed expectations.  Frequently, and in Finkelstein's case, the purchase of a primary residence is the single largest investment an individual makes.  Unlike commercial property, the purchase of residential property is not only a financial investment—it is a utility: a place to live.  The value of Finkelstein's home on State Street, therefore, is not measured only by its fair market value, but by its utilitarian value to Finkelstein.  Application of § 14:91.2 to Finkelstein prohibits him from living there—and from being on the property at all,

---

[41] *Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000).

rendering its utilitarian value to zero.

### III. THE LAW IS UNCONSTITUTIONAL ON ITS FACE.

#### A. Section 14:91.2 is unconstitutionally vague.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[42] A criminal statute violates the Due Process Clause of the Constitution "if it is so vague that a person of ordinary intelligence does not have a reasonable opportunity to know what is prohibited, and if the law provides no explicit standards for enforcement."[43] To successfully challenge § 14:91.2 as being unconstitutionally vague, Finkelstein "must show that he could not have reasonably understood that his conduct was prohibited by the statute."[44]

The conduct that violates § 14:91.2, and in particular, subsection (A)(2) is not clear because of the language "public or private elementary school or secondary school or child care facility as defined in R.S. 46:1403." Section 1403 defines a "school" as "any institution or facility which provides for education of children in grades one or above. Any kindergarten or prekindergarten attached thereto shall be considered part of that school."[45] The section does not define "child care facility." Would this include a residence where children are home-schooled? Would this include a location where children are given music lessons? Dance lessons? A summer camp?

---

[42] *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted).
[43] *United States v. Wicker,* 933 F.3d 284, 288 (5th Cir. 1991) (*citing Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)).
[44] *Id.*
[45] La. Rev. Stat. § 46:14039(A)(10).

Further, the definitions are not consistent. Section 14:91.2 designates the schools as elementary or secondary schools. But § 46:14039(A)(10) puts no limit on the schools, only that they provide for the education of children in grades one or above. Would Tulane and Loyola Universities be considered as schools under that section? What if those universities provide classes or recreational programs for students of elementary or secondary school age? Because the statute does not adequately define the terms, it encourages arbitrary enforcement by vesting virtually complete discretion in the USPO and State law enforcement to determine what is a school, and accordingly, where a sex offender may reside, or where a sex offender may merely be present.

The terminology in § 14:91.2 "public or private elementary school or secondary school or child care facility as defined in R.S. 46:1403" is not clear on its own, and is in fact further complicated by the definition provided in § 1403. As a result, this criminal statute does not adequately provide notice as to the conduct that is prohibited, and leaves unfettered enforcement discretion with the State to determine the conduct that is prohibited.

### B. Section 14:91.2 infringes upon the right to intrastate travel.

The Supreme Court has not decided whether there is a fundamental right to intrastate travel,[46] although it observed long ago that under the Articles of Confederation, state citizens "possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom."[47]

---

[46] *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 255-56 (1974).
[47] *United States v. Wheeler,* 254 U.S. 281, 293 (1920).

Some circuits have recognized a fundamental right to intrastate travel in the context of a "drug exclusion zone" that banned persons from an area of a city for a period of time,[48] an ordinance that outlawed "cruising" and thus limited the ability of persons to drive on certain major public roads,[49] and a law that created a durational residency requirement as a condition of eligibility for public housing.[50] The Second Circuit, for example, reasoned that it would be "meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."[51] Other decisions have held that there is *no* fundamental right to intrastate travel in the context of a bona fide residency requirement imposed as a condition of municipal employment.[52]

Section 14:91.2 restricts the *mere presence* of a sex offender "in, on, or within one thousand feet of the school property of any public or private elementary or secondary school or the physical presence in any motor vehicle or other means of conveyance owned, leased, or contracted by such school to transport students to or from school or a school-related activity when persons under the age of eighteen years are present on the school property or in a school vehicle[,]"[53] *and* "in, on, or within one thousand feet of a public park, recreational facility, or child care facility as defined in R.S. 46:1403[,]"[54] *and* "in or on public library property."[55] It also criminalizes "loitering within one thousand feet of public library property."[56]

---

[48] *Johnson v. City of Cincinnati,* 310 F.3d 484, 496-98 (6th Cir. 2002).
[49] *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990).
[50] *King v. New Rochelle Mun. Hous. Auth.,* 442 F.2d 646, 647-48 (2d Cir. 1971).
[51] *Id.* at 648; *see also Johnson,* 310 F.3d at 497 n. 4; *Lutz,* 899 F.2d at 261.
[52] *Andre v. Bd. of Trs. of Maywood,* 561 F.2d 48, 52-53 (7th Cir. 1977); *Wardwell v. Bd. of Educ.,* 529 F.2d 625, 627 (6th Cir. 1976); *Wright v. City of Jackson,* 506 F.2d 900, 901-02 (5th Cir. 1975).
[53] La. Rev. Stat. § 14:91.2(A)(1).
[54] *Id.* § 14:91.2(A)(3).
[55] *Id.* § 14:91.2(A)(5).
[56] *Id.* § 14:91.2(A)(6).

Unlike the Iowa residency restriction upheld by the Eighth Circuit in *Miller*, which "does not prevent a sex offender from entering or leaving any part of the State, including areas within 2000 feet of a school or child care facility, and it does not erect any actual barrier to intrastate movement," Louisiana's residency restriction does just that.[57] By prohibiting the physical presence of a sex offender within the restricted zones, Louisiana's law necessarily restricts a sex offender's travel. One need only think of the route one takes from home to work every day, and the number of schools, parks, and libraries that are passed along the way. If Lafayette Square is a public park, Finkelstein would be committing a crime every time he appeared for a scheduled meeting with his probation officer at the Hale Boggs Federal Building.

This section of Louisiana law is also not comparable to the one upheld by the Seventh Circuit.[58] The City of Lafayette banned sex offenders from all public parks. But the ban did not implicate the fundamental right to intrastate travel, because the offenders were "not limited in moving from place to place within his locality to socialize with friends and family, to participate in gainful employment or to go to the market to buy food and clothing." Many of these bans permit the presence in or on the designated property, such as a park or a school. The Louisiana residency-restriction statute goes further: it bans the presence of a sex offender within 1,000 feet of the property. This buffer zone will prevent Finkelstein from driving down nearly every street in New Orleans.

## CONCLUSION

Louisiana's residency-restriction statute is far more draconian than other states' analogs. It is a criminal statute that punishes not only residence, but mere presence, in many restricted *zones*. And unlike the analogous statutes throughout the country, Louisiana's does not contain

---

[57] *Miller*, 405 F.3d at 713.
[58] *Doe v. City of Lafayette,* 377 F.3d 757, 770-71 (7th Cir. 2004) (en banc).

exceptions or exemptions. Frequently, those exceptions save the statute from an attack of unconstitutionality. Not so here.

The application of La. Rev. Stat. § 14:91.2 to Finkelstein violates the *Ex Post Facto* Clause on two counts. It is also an unconstitutional taking of liberty and property without due process of law, a violation of the freedom to associate; and a violation of the right to travel. Finally, the statute is unconstitutionally vague. For all of these reasons, or even one, Finkelstein's motion should be granted, and the USPO and the State of Louisiana should be enjoined from enforcing § 14:91.2 against Finkelstein.

Respectfully submitted,

_____
Herbert V. Larson, Jr. (La. Bar No. 8052)
Sara A. Johnson (La. Bar No. 31207)
The Law Offices of Herbert V. Larson, Jr.
700 Camp Street
New Orleans, LA 70130
(504) 528-9500
hvl@hvllaw.com
saj@hvllaw.com

Attorneys for Mayer Finkelstein

## CERTIFICATE OF SERVICE

This certifies that I filed the foregoing using the CM/ECF system, which will send a copy to all counsel of record, and that I have served a copy of this motion upon the Attorney General for the State of Louisiana, by sending him a copy via certified mail, properly addressed, return receipt requested, first class postage prepaid.

Dated: September 12, 2013.

_____
Herbert V. Larson, Jr.